WK:HDM
F. #2017R02216

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MICHAEL BLACK and
GARRETT O'ROURKE,
   also known as "Jonathan Banks,"

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

**To Be Filed Under Seal**

19-MJ-644 (SMG)

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(18 U.S.C. § 371)

EASTERN DISTRICT OF NEW YORK, SS:

      KURT DENGLER, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

      Upon information and belief, on or about and between April 1, 2016 and June 30, 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL BLACK and GARRETT O'ROURKE, also known as "Jonathan Banks," together with others, did knowingly and willfully conspire to use and employ manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing one or more devices, schemes and artifices to defraud; (b) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in one or more acts, practices and courses of business which would and did operate as a fraud and deceit upon investors and potential investors in AVI Group, Inc. ("AVOP"), a publicly traded company, in connection with the purchase and sale of investments in AVOP, directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff. In furtherance of the conspiracy and to effect its objects, within the Eastern District of New York and elsewhere, the defendants MICHAEL BLACK and GARRETT O'ROURKE, also known as "Jonathan Banks," together with others, committed and caused to be committed overt acts as described herein.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## INTRODUCTION

The source of your deponent's information and the grounds for his belief are as follows:

1.  I have been employed as a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately 20 years. I am currently assigned to an FBI squad that investigates securities fraud, wire fraud and other financial crimes. During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of such investigations, including conducting surveillance,

3

executing search warrants, debriefing defendants and informants, interviewing witnesses, reviewing and analyzing recorded conversations and analyzing telephone toll information.

2. I am familiar with the facts and circumstances set forth below from, among other things: (a) my personal participation in this investigation, (b) discussions with other law enforcement agents involved in this investigation, and (c) my review of consensual recordings, trading information, bank records and interviews of individuals, among other sources of evidence.

3. Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts I learned from other law enforcement agents. Because this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the defendants, I have not set forth each and every fact learned during the course of the investigation described below. Instead, I have set forth only those facts that I believe are necessary to establish probable cause for the arrest warrants sought herein. In addition, where the contents of documents or the actions, statements and conversations of others are reported herein, they are reported in sum and substance and in part.

## PROBABLE CAUSE

### A. Background

#### 1. Relevant Definitions and Regulatory Principles

4. "Microcap" or "penny" stocks referred to stocks of publicly traded U.S. companies which have a low market capitalization. Microcap stocks were often subject to price manipulation because they were thinly traded and subject to less regulatory scrutiny than stocks that traded on notable exchanges. Additionally, large blocks of microcap stock were often controlled by a small group of individuals, which enabled those in the group to control or orchestrate manipulative trading in those stocks.

5. A "convertible note" was a debt security issued by a company that provided the holder of the convertible note the right, in certain circumstances, to convert the note into equity shares in the company.

6. A "call room" was a commercial operation that identified prospective investors, contacted them by telephone and email, and encouraged them to purchase, and subsequently not to sell securities.

7. A "matched trade" was a purchase and a sale of securities that was pre-arranged so that the purchase and sale orders matched each other in price, volume, and time of execution. This arrangement fraudulently increased the trading volume of the securities and also permitted the seller to sell securities when, absent such an arrangement, there otherwise would not be a market demand for such securities.

8. A "pump and dump" scheme was a scheme where a group of individuals who controlled the free trading or allegedly unrestricted shares—also referred to

as the "float"—of a microcap company fraudulently inflated the share price and trading volume of the targeted public company through, inter alia, matched trades, false and misleading SEC filings, press releases and paid stock promotions. When the target company's share price reached desirable levels, the individuals sold their free trading shares for substantial financial gain.

2.  **Relevant Entities and Individuals**

9.  The defendant MICHAEL BLACK was a United States citizen and resident of Annapolis, Maryland. Based on my review of the corporate records for Neoventive LLC ("Neoventive"), BLACK was the sole owner of Neoventive ("Neoventive"), a Maryland corporation, which he used to purchase, sell and hold securities.

10. The defendant GARRETT O'ROURKE, also known as "Jonathan Banks," was a United States citizen and resident of Miami Beach, Florida. Based on my review of the corporate records for Tactical Holding Corp. ("Tactical"), O'ROURKE was the sole owner of Tactical, a Florida corporation, which he used to purchase, sell, and hold securities.

11. AV1 Group Inc., ("AVOP"), a Florida corporation with its principal place of business in La Jolla, California, was a publicly-traded company that traded under the ticker symbol "AVOP." AVOP purported to be a holding company focusing on acquisitions and joint ventures, including the development of dental equipment, a "vape" superstore, and lighting technology, among others. AVOP, a microcap stock, was quoted on OTC Link (previously, the "Pink Sheets"), operated by OTC Markets Group, Inc.

**B.     The Fraudulent Scheme**

12.     In or about and between April 1, 2016 and June 30, 2017, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants MICHAEL BLACK and GARRETT O'ROURKE, together with others (the "AVOP Co-Conspirators), agreed to defraud investors and potential investors in AVOP by artificially controlling the price and volume of AVOP shares through (a) false and misleading statements made to potential investors from call rooms based in the State of Florida and Medellin, Colombia, (b) wire payments amongst AVOP Co-Conspirators, and (c) matched trades in AVOP shares.

1.      **The AVOP "Pump and Dump" Scheme**

(i)     **Acquisition of AVOP Shares**

13.     On April 6, 2016, the defendant MICHAEL BLACK, using an account he controlled in the name of Neoventive, purchased convertible notes, previously issued by AVOP, from a financial entity, the identity of which is known to me, for approximately $700.  On April 26, 2016, BLACK converted the notes into approximately seven million AVOP shares.  After BLACK acquired these shares, the total number of free-trading AVOP shares was approximately 14.2 million.  Thus, BLACK acquired nearly half of the free trading AVOP shares at a cost of approximately $0.0001 per share.

(ii)    **The Manipulation of AVOP**

14.     In or about May 2016, the defendant MICHAEL BLACK enlisted the help of call rooms, one based in Florida and another in Medellin, Colombia, to fraudulently entice potential investors to purchase and retain AVOP shares.  Based upon the review of

bank records and wire transactions involving the AVOP Co-Conspirators, it appears that the defendant GARRETT O'ROURKE was the head of the call room based in Florida (the "Florida Call Room") as he was primarily providing the proceeds from the Florida Call Room to other AVOP Co-Conspirators. Co-Conspirator 1 was the head of the call room based in Medellin, Colombia. I refer to these two call rooms as the "Call Rooms."

15. Individuals who worked at the Call Rooms falsely informed potential victim investors that they worked for an entity called Marketwise Report ("Marketwise"), a purported investment advising firm located in Florida that offered stock advice to clients. Contrary to this and other false representations made by the defendant GARRETT O'ROURKE, and other AVOP Co-Conspirators who worked at the Call Rooms, Marketwise was in fact a fictitious entity and was used to artificially increase the market demand for, and the price of, AVOP shares so that BLACK could sell his AVOP shares at an artificially inflated price and share the proceeds of such fraudulent sales with O'ROURKE and the AVOP Co-Conspirators.

16. In discussions with investors, AVOP Co-Conspirators operating out of the Call Rooms made material misrepresentations about themselves and Marketwise, including using false names and identities. Among other things, they made false and misleading statements about AVOP and AVOP shares in order to persuade victim investors to purchase AVOP shares and also to retain AVOP shares they had already purchased. For example, on May 4, 2016, the defendant GARRETT O'ROURKE, began soliciting Victim

Investor 2, a resident of Massachusetts, to purchase AVOP shares.[1] O'ROURKE, operating out of the Florida Call Room, placed telephone calls to Victim Investor 2 in Massachusetts and falsely informed Victim Investor 2 that AVOP was an "IPO" and that O'ROURKE would be able to get Victim Investor 2 in on the "ground floor" of the investment. O'ROURKE promised that after about a month, Victim Investor 2's investment in AVOP shares would be up between "300% and 1000%," and that O'ROURKE "planned on making a few people," including Victim Investor 2, "a small fortune." O'ROURKE falsely claimed that AVOP (1) was "cash heavy . . . was buying assets and seeing twelve to fourteen times return" on its investments; and (2) had better profit margins than Apple stock. Based on the false statements and material misrepresentations O'ROURKE made to Victim Investor 2 regarding himself, Marketwise, and the AVOP shares, on May 6, 2016, Victim Investor 2 purchased 50,000 AVOP shares at $0.50 per share.

### (iii) Selling off AVOP Shares at Investor's Expense

17. At the same time as the AVOP Co-Conspirators operating out of the Call Rooms manipulated and increased AVOP's stock price by encouraging victim investors to purchase and retain AVOP shares, the defendant MICHAEL BLACK sold his AVOP shares. As discussed above (see ¶ 13), BLACK acquired them for approximately $0.0001 per share and sold them for far higher prices, reaping significant profits.

18. Between March 30, 2016 and April 26, 2016, there was no trading of AVOP shares. In contrast, after the defendant MICHAEL BLACK had acquired AVOP

---

[1] Victim Investor 2 recorded calls that took place between the defendant GARRETT O'ROURKE and himself.

shares, in or about and between April 27, 2016, and June 30, 2016, trading commenced with as many as 1.56 million shares traded in a single day, May 6, 2016. During this period, the closing price of AVOP shares generally rose from a closing price of $0.06 on April 27, 2016, to a closing price of $1.00 on June 30, 2016. During this period, AVOP shares reached their highest closing price, of $1.44, on June 22, 2016.

19. On May 6, 2016, for example, the defendant MICHAEL BLACK, using an account he controlled in the name of Neoventive, sold 816,000 AVOP shares, accounting for more than 50% of the entire trading volume of AVOP shares on that day. BLACK received the proceeds from these sales in his brokerage account. BLACK then wired $386,678.50 of the proceeds from a brokerage account into a bank account he controlled, and then wired approximately $63,470 of the proceeds to an account controlled by the defendant GARRETT O'ROURKE in the name of Tactical.

20. Throughout May and June 2016, the defendant MICHAEL BLACK continued to sell AVOP shares at artificially inflated prices created and maintained by the Call Rooms. During this period, BLACK, acting through Neoventive, sold a total of approximately 2.7 million AVOP shares for approximately $2,139,614.70. Between May 11, 2016 and June 28, 2016, BLACK transferred $2,093,372.08 from his Neoventive brokerage account to his Neoventive bank account. Between May 12, 2016, and June 28, 2016, BLACK transferred $510,545.00 of these funds from his Neoventive bank account to O'ROURKE's Tactical bank account.

21. I have reviewed trading records for AVOP and based upon my review, during this time period, in May and June 2016, numerous investors, including victim

investors residing in the Eastern District of New York, purchased AVOP shares at artificially inflated prices. Specifically, at least four investors in Queens, Brooklyn and Staten Island, New York purchased AVOP stock in May and June 2016 at artificially inflated investors.

22. Beginning in July 2016, and continuing through October 2016, the price of AVOP shares began to drop. During October 2016, no shares were traded on several days and, during the month, daily trading volume dropped substantially. By November 3, 2016, the trading volume of AVOP was just 3,920 shares, with a closing price of approximately $0.25 per share.

23. While the share price and trading volume of AVOP continued to drop in October and November 2016, the AVOP Co-Conspirators continued their activities from the Call Rooms to entice investors to purchase or not to sell AVOP shares. For example, the defendant GARRETT O'ROURKE continued to make false statements, and fraudulent representations regarding himself and AVOP shares. In one telephone call, O'ROURKE, using the false name Jonathan Banks, among other things encouraged the following to Victim Investor 2: "do something small, I'm not telling you to put $100,000 in here and make $700,000, but put $25,000 in there, you know? Make $100,000 in additional profit to cover any losses and you'll make some money. I know in my heart of hearts that this is going to work." Victim Investor 2 did not buy any AVOP shares as O'ROURKE had encouraged, but, based upon O'ROURKE's representations, he also did not sell any—as he had initially wanted to do. By January 31, 2017, the AVOP share price had fallen further to $0.06 per share.

2. **The AVOP Matched Trade Scheme**

24. Although the defendant MICHAEL BLACK had sold a significant portion of his AVOP shares by late 2016, beginning on or about December 9, 2016 BLACK set out to use matched trades to sell his remaining AVOP shares and to transfer proceeds from the above-referenced pump and dump scheme to AVOP Co-Conspirators. The AVOP Co-Conspirators sought to conduct this scheme through Co-Conspirator 2. Undercover 1, a FBI Special Agent who was working in an undercover capacity and whose identity is known to me, purported to represent a group of corrupt stock brokers that Co-Conspirator 2 believed would further the matched trade scheme.

25. As part of the matched trade scheme, the defendant MICHAEL BLACK, using an account he controlled in the name of Neoventive, placed orders to sell AVOP shares in a specified quantity, for a specified price and at a specified time. The "corrupt brokers," purportedly represented by Undercover 1, placed orders to buy AVOP shares that matched the terms of BLACK's order to sell. In exchange, BLACK provided the corrupt brokers a payment, which were transferred to Co-Conspirator 2 and then to Undercover 1.

26. On or about February 2, 2017, Undercover 1 and Co-Conspirator 2 spoke on the telephone regarding the defendant MICHAEL BLACK's plan to liquidate his remaining AVOP shares through matched trades. Co-Conspirator 2 stated that "BLACK is all ready to go . . . he's been calling me every day now . . . they [the AVOP Co-Conspirators] are ready to go with more news, once we start they are going to help with whatever we need . . . He paid me up to a couple days ago . . . He settled up so we are good."

27. On or about February 13, 2017, Undercover 1 spoke on the telephone with Co-Conspirator 2 regarding the sale of the defendant MICHAEL BLACK's remaining AVOP shares through matched trades. Co-Conspirator 2 stated that he "Spoke to BLACK, and they are going to have news out before the open tomorrow . . . so we are ready to go tomorrow if the guys are ready." Undercover 1 responded, "If it comes out we will definitely do it [i.e. buy the AVOP shares]". Co-Conspirator 2 then said "Before the open you will be able to see it . . . 8:30am or 9am, in that range."

28. On or about February 14, 2017, prior to the market opening, AVOP issued a press release. That same day, Undercover 1 sent Co-Conspirator 2 a text message, stating, "Saw the release. Just waiting for my guy to be available. Will call you soon to do one today." Co-Conspirator 2 then responded, "K. Let me know!" Later on February 14, 2017, an account controlled by the government (purported to be controlled Undercover 1) bought 94,000 shares of AVOP. Shortly thereafter, BLACK called Co-Conspirator 2 to state that something had gone wrong with the matched trade and he was not able to "capture" the trade. BLACK, in a recorded telephone conversation, discussed a thwarted attempt to sell shares in a matched trading arrangement with Co-Conspirator 2:

> BLACK: We did not get that sale.
>
> Co-Conspirator 2: Oh really. So it went through?
>
> BLACK: Yes, what happened is . . . how it's looking is I put my order in and it showed ninety seven seven at .043, ok? And then three thousand seven hundred went through at four and then ninety-four went through at .043, and I thought great we got it. But then I looked and it's still showing .043 on the ask and it's showing my order still open . . . so I didn't get it.

>Co-Conspirator 2: So someone somehow somebody else got it.
>
>BLACK: Apparently.
>
>Co-Conspirator 2: So is that 100% and I should tell Joe or you want me to hold off?
>
>BLACK: Let's just . . . the order system is screwed up . . . it doesn't show it as completed yet . . . let's just wait a little bit and see what's up cause it's a little whacky.

29. On or about February 16, 2017, Undercover 1, Co-Conspirator 2 and the defendant MICHAEL BLACK had a conference call to discuss the matched trades and the February 14, 2017 trade, which Undercover 1 recorded:

>Undercover 1: So a little glitch yesterday.
>
>BLACK: [laughter] the day before yeah. Yeah that's kind of odd, I did recover some of the missing part there. I am ready any time you guys are. I just want to hear mechanically how you want to know I am set and how we can make it work.
>
>Undercover 1: Timing is key here.
>
>BLACK: In terms of timing, I'm usually ready well before you guys are . . . so you just tell me how you want to proceed and we'll get it done.
>
>Undercover 1: Good. And that's good to . . . we have to make sure we do this matched trade perfectly, because if you are not offering it, obviously I don't want to come in and bid for it and take somebody else out.
>
>BLACK: Right.
>
>Undercover 1: So we have to kind of do get our orders in simultaneous to make it happen, but the key is for you to get in a little before us.
>
>BLACK: Right, as opposed to way too early . . . five minutes is probably way too early.

>           Undercover 1: Ideally like 30 seconds.
>
>           BLACK: I think we can coordinate that.

30.     A short time later, on February 16, 2017, Undercover 1 called Co-Conspirator 2. Undercover 1 stated, "My brokers got the trade all t'd up, for 90,000 at $0.043, so he's ready to do it once I give him the green light." Co-Conspirator 2 responded, "BLACK's ready, so I'll call him and tell him to put it in, and I'll text you right away." A short time after this call, Co-Conspirator 2 texted Undercover 1 to put the buy order in as discussed.

31.     On or about February 16, 2017, an account controlled by the defendant MICHAEL BLACK in the name of Neoventice sold 90,000 shares of AVOP, and the shares were bought by an account controlled by the government (and purported to be controlled by Undercover 1). On this same day, Co-Conspirator 2 met in person with Cooperating Witness 1 ("CW1") and gave CW1 $2,000 in cash as this was payment to Undercover 1 for Undercover 1's purchase of AVOP shares on February 14, 2017, and for the matched trade Undercover 1 executed with BLACK on February 16, 2017.

32.     On or about February 23, 2017, a bank account in the name of Neoventive, controlled by the defendant MICHAEL BLACK, wired $2,970 to a bank account in the name of Co-Conspirator 2 as reimbursement to Co-Conspirator 2 for "fronting" the kickback payment to Undercover 1 on February 16, 217, as referenced above.

33.     Between December 9, 2016 and February 14, 2017, the defendant MICHAEL BLACK, Co-Conspirator 2 and Undercover 1 engaged in matched trades of approximately 211,500 shares of AVOP for approximately $23,197.

15

WHEREFORE, your deponent respectfully requests that the defendants MICHAEL BLACK and GARRETT O'ROURKE, be dealt with according to law. Because public filing of this document could result in a risk of flight by the defendants MICHAEL BLACK and GARRETT O'ROURKE, as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as the arrest warrants issued in connection with this complaint, be filed under seal.

_____
KURT DENGLER
Special Agent, Federal Bureau of Investigation

Sworn to before me this
17 day of July, 2019

_____
THE HONORABLE STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK